# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

MADHAVI BHAMIDIPATI,
    Plaintiff,

  vs.

COMMISSIONER OF
SOCIAL SECURITY,
    Defendant.

Case No. 1:18-cv-443
Litkovitz, M.J.

**ORDER**

    Plaintiff Madhavi Bhamidipati brings this action pursuant to 42 U.S.C. § 405(g) for

judicial review of the final decision of the Commissioner of Social Security (Commissioner)

denying her application for disability insurance benefits ("DIB"). This matter is before the

Court on plaintiff's statement of errors (Doc. 15), the Commissioner's response in opposition

(Doc. 23), and plaintiff's reply (Doc. 29).

## I. Procedural Background

    Plaintiff protectively filed her application for DIB on November 9, 2014, alleging

disability since June 26, 2013, from dizziness due to motion of objects, vertigo of central origin,

nerve pain in lower extremities, balance issues, convergence insufficiency and oscillopsia, and

tendonitis in both feet. The application was denied initially and upon reconsideration. Plaintiff,

through counsel, requested and was granted a *de novo* hearing before administrative law judge

("ALJ") Anne Shaughnessy. Plaintiff and a vocational expert ("VE") appeared and testified at

the ALJ hearing on March 22, 2017. On August 2, 2017, the ALJ issued a decision denying

plaintiff's DIB application. This decision became the final decision of the Commissioner when

the Appeals Council denied review on June 1, 2018.

## II. Analysis

### A. Legal Framework for Disability Determinations

To qualify for disability benefits, a claimant must suffer from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 423(d)(1)(A). The impairment must render the claimant unable to engage in the work previously performed or in any other substantial gainful employment that exists in the national economy. 42 U.S.C. § 423(d)(2).

Regulations promulgated by the Commissioner establish a five-step sequential evaluation process for disability determinations:

1) If the claimant is doing substantial gainful activity, the claimant is not disabled.

2) If the claimant does not have a severe medically determinable physical or mental impairment – *i.e.*, an impairment that significantly limits his or her physical or mental ability to do basic work activities – the claimant is not disabled.

3) If the claimant has a severe impairment(s) that meets or equals one of the listings in Appendix 1 to Subpart P of the regulations and meets the duration requirement, the claimant is disabled.

4) If the claimant's impairment does not prevent him or her from doing his or her past relevant work, the claimant is not disabled.

5) If the claimant can make an adjustment to other work, the claimant is not disabled. If the claimant cannot make an adjustment to other work, the claimant is disabled.

*Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 652 (6th Cir. 2009) (citing 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 404.1520(b)-(g)). The claimant has the burden of proof at the first four steps of the sequential evaluation process. *Id.*; *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 548 (6th Cir. 2004). Once the claimant establishes a prima facie case by showing an inability to

perform the relevant previous employment, the burden shifts to the Commissioner to show that

the claimant can perform other substantial gainful employment and that such employment exists

in the national economy. *Rabbers*, 582 F.3d at 652; *Harmon v. Apfel*, 168 F.3d 289, 291 (6th

Cir. 1999).

### B. The Administrative Law Judge's Findings

The ALJ applied the sequential evaluation process and made the following findings of

fact and conclusions of law:

> 1. The [plaintiff] meets the insured status requirements of the Social Security Act through December 31, 2018.
>
> 2. The [plaintiff] has not engaged in substantial gainful activity since June 26, 2013, the alleged onset date (20 CFR 404.1571 *et seq.*).
>
> 3. The [plaintiff] has the following severe impairment: Persistent postural perceptual dizziness (20 CFR 404.1520(c)).
>
> 4. The [plaintiff] does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).
>
> 5. After careful consideration of the entire record, the [ALJ] finds that the [plaintiff] has the residual functional capacity [("RFC")] to perform light work as defined in 20 CFR 404.1567(b) except for the following restrictions: She can stand and walk for four hours. She can never climb ladders, ropes or scaffolds. She can occasionally crouch and crawl. She cannot read fine print. She should avoid all exposure to hazards.
>
> 6. The [plaintiff] is unable to perform any past relevant work (20 CFR 404.1565).[2]
>
> 7. The [plaintiff] was born [in] . . . 1978 and was 35 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563).

---

[2]Plaintiff's past relevant work was as a quality assurance analyst and a teller, both light, skilled jobs. (Tr. 31, 75).

8. The [plaintiff] has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the [plaintiff] is "not disabled," whether or not the [plaintiff] has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the [plaintiff]'s age, education, work experience, and residual functional capacity, there were jobs that exist in significant numbers in the national economy that the [plaintiff] can perform (20 CFR 404.1569 and 404.1569(a)).[3]

11. The [plaintiff] has not been under a disability, as defined in the Social Security Act, from June 26, 2013, through the date of this decision (20 CFR 404.1520(g)).

(Tr. 17-32).

## C. Judicial Standard of Review

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g) and involves a twofold inquiry: (1) whether the findings of the ALJ are supported by substantial evidence, and (2) whether the ALJ applied the correct legal standards. *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see also Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007).

The Commissioner's findings must stand if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citing *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance. . . ." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). In

---

[3] The ALJ relied on the VE's testimony to find that plaintiff would be able to perform the requirements of representative light, unskilled jobs such as packager, with 50,000 jobs in the national economy; sorter, with 50,000 jobs in the national economy; and bench assembler, with 50,000 jobs in the national economy. (Tr. 32, 76).

deciding whether the Commissioner's findings are supported by substantial evidence, the Court

considers the record as a whole. *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978).

The Court must also determine whether the ALJ applied the correct legal standards in the

disability determination. Even if substantial evidence supports the ALJ's conclusion that the

plaintiff is not disabled, "a decision of the Commissioner will not be upheld where the SSA fails

to follow its own regulations and where that error prejudices a claimant on the merits or deprives

the claimant of a substantial right." *Rabbers*, 582 F.3d at 651 (quoting *Bowen*, 478 F.3d at 746).

*See also Wilson*, 378 F.3d at 545-46 (reversal required even though ALJ's decision was

otherwise supported by substantial evidence where ALJ failed to give good reasons for not

giving weight to treating physician's opinion, thereby violating the agency's own regulations).

### D. Medical Evidence

On June 21, 2013, plaintiff consulted with neurologist Dr. Omar Mulla-Ossmann, M.D.,

for nausea, vertigo, headaches, and ataxia. (Tr. 418-20). The doctor reported that plaintiff had

spent a few days at the Smoky Mountains and became sick. After she returned home, she had

persistent symptoms of vertigo and headaches. Dr. Mulla-Ossmann indicated that plaintiff

experienced "two particular episodes of severe vertigo in the beginning, twenty days ago, and

four days ago. The headache [wa]s spreading around her head and neck, she could barely keep

her balance, she ha[d] no appetite, [and] she was seen by ENT and no abnormalities were seen."

(Tr. 418). Dr. Mulla-Ossmann found plaintiff's gait was slow and cautious but still steady with

no ataxia. (*Id.*). Dr. Mulla-Ossmann assessed a probable viral syndrome causing cerebellar

myelitis. (Tr. 420).

On June 25, 2013, plaintiff presented to the emergency department with dizziness,

nausea, shortness of breath, left neck pain, and a sensation that she had no control of her body

parts above her waist. (Tr. 1072-74). She was admitted for a neurological concern that had yet to be determined. Diagnostic studies, including x-rays and MRIs, yielded no acute findings. Dr. Mulla-Ossmann suspected viral syndrome cerebral myelitis, but he noted test results were normal. Plaintiff was hospitalized until June 29, 2013. (Tr. 1074-95).

Plaintiff was seen again on July 9, 2013, by Dr. Mulla-Ossmann. Plaintiff complained that she was feeling shaky and her legs and thighs were preventing her from standing up and walking. Dr. Mulla-Ossmann noted that plaintiff's gait was cautious but not steady and that she was using a walker. (Tr. 416-17). When seen on July 23, 2013, plaintiff reported to Dr. Mulla-Ossmann that she was "walker dependent." (Tr. 414).

Plaintiff was again hospitalized from July 23 to July 27, 2013 with progressive weakness over the last two months. (Tr. 1102). She was diagnosed with weakness of both arms and lower limbs and "functional weakness." (Tr. 1107). She was discharged to a rehabilitation facility.

Plaintiff was admitted to Drake Hospital for rehabilitation from July 27, 2013 through August 10, 2013 due to difficulties with muscular fatigue and chronic dizziness with activity. (Tr. 422-580). She received inpatient physical and occupational therapy to address weakness in her extremities. Over time plaintiff was able to improve her functioning. (*Id.*)

In February 2014, Mark Goddard, M.D., plaintiff's treating physical medicine and rehabilitation specialist, assessed that plaintiff continued to have weakness and fatigue and he was uncertain of the cause. (Tr. 2434). Dr. Goddard reported in May 2014 that plaintiff could not do much in the way of close computer work or reading because of her visual problems. (Tr. 2474-75).

Plaintiff underwent her first functional capacity evaluation with Rick Wickstrom, P.T., in April 2014. (Tr. 1480-99). Mr. Wickstrom found plaintiff was completely cooperative and provided a consistent performance during functional capacity testing. She demonstrated objective findings that were consistent with an unspecified neurological disorder. Plaintiff exhibited mild right foot drop and increased right greater than left lower extremity extensor tone that was classic for a neurological disorder of the upper motor neurons. She fatigued easily in response to prolonged conversation and got very dizzy in response to atypical head movements, such as turning her head from side to side or attempting tasks such as keyboarding. Plaintiff had to take frequent breaks with her eyes closed during the exam. When she focused on Mr. Wickstrom's finger closer to her nose, he observed plaintiff had "significant nystagmus (rapid side to side eye movements)," which was consistent with her report of dizziness and her near vision impairment with both eyes open. She demonstrated normal near vision when either eye was occluded, suggesting that her symptoms of dizziness may be reduced and performance on near vision tasks improved with the use of an eye patch. (Tr. 1499). Mr. Wickstrom concluded that plaintiff could lift up to five pounds, occasionally stand, frequently sit, seldom reach high above the shoulders, seldom forward bend or stoop, and seldom do low work such as kneeling or squatting. (Id.).

Plaintiff was examined by various specialists at the Cleveland Clinic beginning in June 2014 for complaints of imbalance and lower-extremity weakness. (Tr. 1660-69, 2596-2616, 2671-98). Her vestibular testing was normal. (Tr. 2610). The specialist who evaluated plaintiff believed her symptoms were triggered by a viral infection which was slowly resolving over time, and he believed continued conservative management and physical therapy would result in the resolution of her symptoms. (Tr. 2599). In March 2015, plaintiff underwent a

battery of tests which disclosed no clear etiology of her persistent symptoms. (Tr. 2672). Plaintiff was functionally improved and walked independently. (*Id.*). Multiple sclerosis was ruled out after MRI and CSF testing. (*Id.*). Cardiovascular testing yielded normal results, with no diagnostic evidence of a significant cardiovagal or cardiovascular adrenergic abnormality. (Tr. 2685-86).

In January 2015, after reviewing plaintiff's file, state agency physician Steve McKee, M.D., found that plaintiff could lift and carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk for about 4 hours in an 8-hour workday; and sit for about 6 hours in an 8-hour workday. (Tr. 96). Dr. McKee also determined that plaintiff could occasionally climb ramps or stairs, crouch, or crawl; frequently balance, stoop, or kneel; and never climb ladders, ropes, or scaffolds. (*Id.*). Dr. McKee based his limitations on plaintiff's vertigo, imbalance, generalized extremity weakness, fatigue, and lumbar degenerative disc disease. (Tr. 96-97). Plaintiff was also found to be limited to no reading of fine print with both eyes, and she was to avoid all exposure to hazards such as machinery and heights. (*Id.*).

State agency physician William Bolz, M.D., reviewed plaintiff's file on reconsideration and affirmed Dr. McKee's assessment in May 2015. (Tr. 114-16). Dr. Bolz noted that the Cleveland Clinic records showed plaintiff had a negative work-up on March 7, 2015; her symptoms were improved and she was walking independently; and there was "no need for further evaluation as she is functionally improved." (Tr. 116, Tr. 2672).

Plaintiff consulted with specialists at the Mayo Clinic in February 2016. Plaintiff underwent a battery of tests, including an autonomic reflex screen, MRI of the head, and audiometry, all of which were normal. (Tr. 2783, 2785). A thermoregulatory sweat test was

normal, "arguing against an autonomic neuropathy." (Tr. 2783). The impressions of the Mayo

Clinic were as follows:

> 1. There were no objective indications of peripheral vestibular system involvement
> noted.

> 2. The delayed latencies leftward noted during saccade testing raise the possibility
> of central vestibule-ocular pathway involvement; however, the patient reports weak
> ocular muscles which is likely playing a contributing factor in this finding.
> Clinical correlation [is] advised. There were no other objective indications for
> central vestibulo-ocular pathway involvement noted.

> 3. [Plaintiff's] ability to maintain upright stance under a variety of changing sensory
> input conditions was abnormal. However, the degree of difficulty exhibited was
> inconsistent with her ability to ambulate down the hall and between test rooms.

> 4. The presentation of her symptoms suggests the development of Persistent
> Postural-Perceptual Dizziness (3PD — former Chronic Subjective Dizziness
> Syndrome — CSD).

(Tr. 2751). Plaintiff was prescribed Effexor and recommended as a candidate for a vestibular

and balance rehabilitation program. (Tr. 2751).

In April 2016, plaintiff resumed physical therapy for unspecified disequilibrium and

exercise tolerance. (Tr. 2982). Her goal was to decrease dizziness to "improve driving and

computer work tolerance." (Tr. 2982). Plaintiff reported doing stretches and 30 minutes of

yoga each day, up to 30 minutes of riding a recumbent bike, and vestibular exercises as her

symptoms allowed. (Tr. 2986). In July 2016, plaintiff took a hiatus from physical therapy for

regulation of her medication. (Tr. 3034).

Mr. Wickstrom administered a second functional capacity evaluation in July 2016. (Tr.

2804-20). Plaintiff reported being disabled by nausea, dizziness, and headaches that she related

to her diagnosis of Persistent Postural Perceptual Dizziness. (Tr. 2806). During testing,

plaintiff took multiple rest periods during which she closed her eyes and put her head down on

her arms for 5-10 minutes. She consistently complained of dizziness and nausea in response to tasks that required a near vision focus. Plaintiff's balance and functional lifting were improved since her last functional capacity exam in 2014. She was no longer dependent on using an assistive device for ambulation, and she no longer had physical exam findings of hyper-reflexia or increased extensor tone in the lower extremities. She continued to have persistent fatigue and limiting behaviors that prompted her to take frequent rest breaks in response to tasks that required near vision or movement stimulus. Mr. Wickstrom opined that plaintiff could lift up to twenty pounds, occasionally stand, and constantly sit. Mr. Wickstrom also opined that plaintiff's visual limitations prevent her from working on a full-time basis, and she is unable to perform work tasks that require near vision on more than an occasional basis due to visual fatigue and nausea that prompts her to close her eyes and rest with her head down. (Tr. 2819).

On July 28, 2016, plaintiff established treatment with optometrist Brenda Montecalvo, O.D. (Tr. 3068-75). Dr. Montecalvo reported in August 2016 that plaintiff experienced extreme visual fatigue with much light sensitivity and eye discomfort during her evaluation. Dr. Montecalvo found that plaintiff's responses to these tests were not experienced by normal patients. The tests are designed to simply gather information about eye health and vision and do not normally create eye strain and fatigue. Dr. Montecalvo reported that plaintiff's visual condition distorts how visual information is processed by localizing objects in closer areas of space than they are actually located. Dr. Montecalvo also found that plaintiff's ability "to process central vision and ignore peripheral is difficult which creates much discomfort, dizziness and disorientation. The harder she tries to focus the worse the convergence excess becomes." (Tr. 2911). According to Dr. Montecalvo, plaintiff "currently will not be able to complete sedentary work such as a receptionist." (*Id.*). Dr. Montecalvo stated that plaintiff's use of a

10

computer "for any more than a minute will create extreme visual discomfort and disorientation." (*Id.*). She described plaintiff's visual disturbances as "complex." (*Id.*). Dr. Montecalvo found that plaintiff's visual disturbances are more intense when the stimulus is up close, such as when working with her hands in front of her or reading for a long period of time. (*Id.*). Dr. Montecalvo reported that during testing, plaintiff had to take frequent rest breaks to hide her eyes from stimulus and the lighting in her office. Dr. Montecalvo opined that "[d]uring a work day, in her present condition, I estimate that she would be unproductive over 60% of the time." (*Id.*). Plaintiff was diagnosed with esotropia (a condition in which one or both eyes turn inward); unspecified subjective visual disturbances; diplopia (double vision); and convergence excess (imbalance of eye muscles which leads to a tendency for eyes to turn inwards). (Tr. 2912). She recommended that plaintiff wear specialized lenses and attend vision therapy. (*Id.*). Dr. Montecalvo opined that "[p]ossibly with aggressive vision rehabilitation she may be able to perform such tasks in 5 years." (Tr. 2911).

In January 2017, Dr. Montecalvo reported that she is a "visual rehabilitation specialist with over 20 years' experience," and she opined that plaintiff's vision problem "will not be correctable to a point where it would allow her to work safely and without consequences for at least the next 24 months, and possibly longer." (Tr. 3066). Dr. Montecalvo also characterized plaintiff's disability insurance carrier's opinion that plaintiff could function better with an eye patch as "not part of an appropriate treatment program and will not remediate the problem in any way whatsoever." (Tr. 3065-66).

### E. Specific Errors

On appeal, plaintiff argues that: (1) the ALJ's unfavorable decision is errant because of an overreliance on a missing etiology or objective basis for plaintiff's medical disability; (2)

11

plaintiff's minimal medical improvement is not consistent with the demands of full time work; (3) the ALJ's residual functional capacity is insufficient because it fails to consider plaintiff's need for off-task periods or rest; and (4) the ALJ's treatment of the opinion evidence makes little sense when the "reasons given" are considered. (Docs. 15 and 29). The Court will address plaintiff's assignment of errors in reverse order.

### 1. Weight to treating sources

It is well-established that the findings and opinions of treating physicians are entitled to substantial weight. Medical opinions from treating sources are generally afforded more weight than those from non-treating sources "since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s)[.]" 20 C.F.R. § 404.1527(c)(2). *See Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529-30 (6th Cir. 1997). "Treating-source opinions must be given 'controlling weight' if two conditions are met: (1) the opinion 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques'; and (2) the opinion 'is not inconsistent with the other substantial evidence in [the] case record.'" *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013) (citing 20 C.F.R. § 404.1527(c)(2)).

If the ALJ declines to give a treating source's opinion controlling weight, the ALJ must weigh the factors specified in 20 C.F.R. § 404.1527(c) to decide what weight to give the opinion; specifically, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source. *Gayheart*, 710 F.3d at 376. *See also Shields v. Comm'r of Soc. Sec.*, 732 F. App'x 430, 437 (6th Cir. 2018) (citing *Wilson*, 378 F.3d at 544) (emphasis added); *see also Blakley*, 581 F.3d at 408 ("Treating source

medical opinions [that are not accorded controlling weight] are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527[(c)]"). The ALJ's decision "must contain specific reasons for the weight given to [a] treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." SSR 96-2p, 1996 WL 374188, at *5. *See Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011). This requirement serves two purposes: (1) "it helps a claimant to understand the disposition of [his] case, especially 'where a claimant knows that his physician has deemed him disabled,'" and (2) it "permits meaningful review of the ALJ's application of the [treating-source] rule." *Shields*, 732 F. App'x at 438 (citing *Wilson*, 378 F.3d at 544). The Sixth Circuit has made clear that remand is appropriate "when the Commissioner has not provided 'good reasons' for the weight given to a treating physician's opinion" and when the ALJ has not "*comprehensively* set forth the reasons for the weight assigned to a treating physician's opinion." *Id.* (quoting *Hensley v. Astrue*, 573 F.3d 263, 267 (6th Cir. 2009)) (emphasis added).

The ALJ declined to give controlling weight to Dr. Montecalvo's opinion and ultimately afforded little weight to the opinion. (Tr. 30). The ALJ stated that while plaintiff's subjective complaints of visual symptoms have remained consistent, the record contains virtually no clinical or diagnostic techniques to corroborate those complaints. (Tr. 29).

Plaintiff argues the ALJ did not provide good reasons for affording only little weight to Dr. Montecalvo's opinion. Plaintiff alleges that the ALJ misunderstood the problems, symptoms, and limitations of plaintiff's vision impairment as discussed in Dr. Montecalvo's opinion letter which corroborated plaintiff's symptoms of dizziness and fatigue. Plaintiff asserts

that the ALJ's discussion of an eye patch "begs the question: If the eye patch is of such importance, why is it not part of the RFC create[ed] by ALJ Shaughnessy?" Plaintiff also asserts that Dr. Montecalvo is a "rehabilitation specialist" who was qualified to opine on plaintiff's functional capacity. (Doc. 15 at 26-27).

The ALJ's decision giving little weight to Dr. Montecalvo's opinion is supported by substantial evidence, and the ALJ gave good reasons for this decision. The ALJ reasonably noted that Dr. Montecalvo rendered her August 16, 2016 opinion after treating plaintiff only one time. (Tr. 30). The length of the treatment relationship and frequency of examination is a valid consideration in assessing the weight to give a treating physician's opinion. 20 C.F.R. § 404.1527(c); *Wilson*, 378 F.3d at 544. The ALJ noted that while Dr. Montecalvo's specialization lends some weight to her assessment, the medical evidence did not support or comport with her assessment of plaintiff's limitations.[4] (Tr. 30). For example, Dr. Montecalvo opined that plaintiff's use of a computer for more than one minute "will create extreme visual discomfort and disorientation." (Tr. 29, 2911). However, this opinion was inconsistent with evidence generated both before and after Dr. Montecalvo rendered it. The record shows that as early as October 2013, plaintiff was able to use a computer for up to two *hours* before she became fatigued. (Tr. 1133). In addition, Dr. Montecalvo's notes in November 2016, January 2017, and February 2017, which post-date her August 2016 opinion, showed plaintiff was using the computer anywhere from one to three hours. (Tr. 3085, 3093, 3101). Plaintiff also reported in January 2017 that she could use a computer for up to 40 minutes at a time and could read up to 40 minutes at a time. (Tr. 3093). This evidence substantially supports the ALJ's decision that

---

[4] Dr. Montecalvo is an optometrist and not a medical doctor. The ALJ mistakenly referred to Dr. Montecalvo as an ophthalmologist, a medical or osteopathic doctor who specializes in eye and vision care.

Dr. Montecalvo's extreme opinion was not adequately supported.

The ALJ also reasonably considered that Dr. Montecalvo's opinion on plaintiff's physical functioning exceeded the scope of her treating relationship, which was limited to plaintiff's vision impairment. Dr. Montecalvo opined that plaintiff could not "complete sedentary work as a receptionist," and plaintiff's visual disturbances are more intense with up-close stimulus, such as working with her hands in front of her or reading for a long period of time. (Tr. 2911). However, as the ALJ pointed out, Dr. Montecalvo's opinion letter does not address the effect of plaintiff's vision impairment on a range of light work involving more distant visual stimuli. (Tr. 29). Further, the ALJ took into account Dr. Montecalvo's failure to provide an "objective etiology" for plaintiff's subjective visual symptoms. (Tr. 30, 2911). Dr. Montecalvo described plaintiff's subjective symptoms in detail but found plaintiff's "eye health" was "normal" and that "eye health problems do not contribute to [plaintiff's] visual discomfort." (Tr. 2911).

Finally, the ALJ reasonably considered that Dr. Montecalvo's opinion that plaintiff will remain disabled for years to come is a decision reserved for the Commissioner. (Tr. 31, 2911, 3066). In any event, Dr. Montecalvo's opinion was undermined by the Mayo Clinic information which indicates that plaintiff's PPPD is amenable to treatment in far less time. (Tr. 31, 3112). The ALJ's decision to give little weight to Dr. Montecalvo's opinion is substantially supported by the record.

Plaintiff also contends the ALJ erred in giving only "some weight" to the opinion of Rick Wickstrom, P.T., who administered two separate functional capacity evaluations in April 2014 and July 2016, respectively. The ALJ gave "some weight" to most aspects of Mr. Wickstrom's assessments but "little weight" to his opinion on the functional impact of plaintiff's visual limitations. (Tr. 29). Plaintiff alleges the ALJ failed to give "good reasons" to "Dr."

15

Wickstrom's assessments. (Doc. 15 at 27-28). Plaintiff argues that "Dr. Wickstrom purely

applied his direct clinical observations and objective methodology to determine [plaintiff] had

below sedentary capabilities." (Doc. 29 at 13).

Contrary to plaintiff's assertion, Mr. Wickstrom is a physical therapist and not a

physician. Under the regulations and rulings applicable to plaintiff's claim, only "acceptable

medical sources" as defined under former 20 C.F.R. § 404.1513(a)[5] can provide evidence which

establishes the existence of a medically determinable impairment, give medical opinions, and be

considered treating sources whose medical opinions may be entitled to controlling weight. *See*

SSR 06-03p, 2006 WL 2329939, *2.[6] A physical therapist, like Mr. Wickstrom, is not an

"acceptable medical source" as defined under the applicable Social Security rules and regulations

but instead falls under the category of "other source." *Compare* former 20 C.F.R. § 404.1513(a)

(listing "acceptable medical sources") *with* former 20 C.F.R. § 404.1513(d)(1) (medical sources

not listed in § 1513(a), such as physicians' assistants, chiropractors, and therapists, are

considered to be "other sources" rather than "acceptable medical sources"). *See also Nierzwick*

*v. Comm'r of Soc. Sec.*, 7 F. App'x 358, 363 (6th Cir. 2001) (physical therapist's report not

afforded significant weight because therapist not recognized as an acceptable medical source).

Because physical therapists are not considered acceptable medical sources under the regulations,

---

[5] Former § 404.1513 was in effect until March 27, 2017, and therefore applies to plaintiff's claim filed in 2014. For claims filed on or after March 27, 2017, all medical sources, not just acceptable medical sources, can make evidence that the Social Security Administration categorizes and considers as medical opinions. 82 FR 15263-01 2017 WL 1105348 (March 27, 2017).

[6] SSR 06-3p has been rescinded in keeping with amendments to the regulations that apply to claims filed on or after March 27, 2017, and the rescission is effective for claims filed on or after that date. 82 FR 15263-01, 2017 WL 1105348 (March 27, 2017). Because plaintiff's claim was filed before the effective date of the rescission, SSR 06-3p applies here.

the ALJ was not required to give "good reasons" under the treating physician rule or any special deference to Mr. Wickstrom's findings and reports.

Although information from "other sources" cannot establish the existence of a medically determinable impairment, the information "may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function." SSR 06-03p, 2006 WL 2329939, at *2; former 20 C.F.R. § 404.1513(d). Factors to be considered in evaluating opinions from "other sources" who have seen the claimant in a professional capacity include how long the source has known the individual, how frequently the source has seen the individual, how consistent the opinion of the source is with other evidence, how well the source explains the opinion, and whether the source has a specialty or area of expertise related to the individual's impairment. SSR 06-03p. *See also Cruse v. Comm'r of Social Sec.*, 502 F.3d 532, 541 (6th Cir. 2007). The ALJ "should explain the weight given to opinions from these 'other sources,' or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the [ALJ's] reasoning, when such opinions may have an effect on the outcome of the case." SSR 06-03p, 2006 WL 2329939, at *6.

The ALJ's assessment of Mr. Wickstrom's evaluations is supported by substantial evidence. The ALJ gave some weight to Mr. Wickstrom's April 2014 assessment, which indicated that plaintiff could lift and carry five pounds, occasionally stand, and frequently sit. (Tr. 28). The ALJ considered this assessment was generally consistent with the RFC she adopted and noted that evidence subsequent to Mr. Wickstrom's assessment showed improvement in plaintiff's functioning. (Tr. 29). The ALJ also found that Mr. Wickstrom's functional assessment in July 2016 was consistent with the performance of a range of work at the light exertional level as Mr. Wickstrom opined that plaintiff could lift and carry between ten and

twenty pounds, constantly sit, and occasionally stand/walk. (*Id.*). Nevertheless, the ALJ properly gave little weight to Mr. Wickstrom's assertion that plaintiff's visual limitations would prevent her from working on a full-time basis because Mr. Wickstrom's opinion amounts to an issue reserved for the Commissioner. "A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled." 20 C.F.R. § 404.1527(d)(1); *see also Amir v. Comm'r of Soc. Sec.*, 705 F. App'x 443, 448 (6th Cir. 2017) ("[A] determination concerning whether a claimant is able to work is not a medical opinion, but is instead a legal conclusion on an issue reserved for the Commissioner."). Moreover, the ALJ reasonably determined that as a physical therapist, Mr. Wickstrom's specialized expertise does not lend itself to evaluating the extent of plaintiff's vision impairment and its vocational impact. Accordingly, the ALJ did not err by according little weight to Mr. Wickstrom's opinion that plaintiff's vision limitations would preclude her from full-time work. Plaintiff's assignment of error is overruled.

## 2. Whether the ALJ's RFC is substantially supported by the evidence.

Plaintiff contends the ALJ erred when she assessed an RFC that failed to incorporate plaintiff's need for off-task periods or rest. Plaintiff alleges that her own statements and testimony, as well as the opinion evidence of Mr. Wickstrom and Dr. Montecalvo, support a finding for a more restrictive RFC. Plaintiff alleges the ALJ failed to consider plaintiff's dizziness in any meaningful way by solely limiting the amount of walking plaintiff can perform and excluding fine print reading from the RFC assessment. Plaintiff alleges she needs another person to accompany her for security because of her dizziness, and she needs to close her eyes and take a nap to regain her strength and stamina, neither of which the ALJ accommodated in her RFC. Plaintiff also alleges the ALJ failed to accommodate plaintiff's absenteeism or the side

effects from her medication. (Doc. 15 at 20-22).[7]

The ALJ is responsible for assessing a claimant's RFC based on all of the relevant medical and other evidence. 20 C.F.R. §§ 404.1527(d)(2), 404.1545(a)(3). *See Bingaman v. Comm'r of Soc. Sec.*, 186 F. App'x 642, 647 (6th Cir. 2006). This includes plaintiff's allegations of her symptoms and limitations, which the ALJ is not required to accept. *See Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003) ("an ALJ is not required to accept a claimant's subjective complaints and may properly consider the credibility of a claimant when making a determination of disability").

In this case, the ALJ fully and fairly evaluated plaintiff's allegations of dizziness and fatigue in light of all of the record evidence and reasonably determined that plaintiff retains the RFC to perform a range of light work subject to additional exertional limitations. In making this determination, the ALJ conducted a thorough review of the record evidence of plaintiff's medical history, beginning with the onset of her vertigo and imbalance symptoms in 2013. The ALJ reviewed the many tests and procedures plaintiff underwent over the years to determine the potential cause of, and to obtain treatment for, her symptoms. Plaintiff was ultimately diagnosed with PPPD by the Mayo Clinic doctors, which the ALJ accepted as a severe impairment that imposed work-related limitations on plaintiff. Nevertheless, a diagnosis of PPPD is not per se disabling. *See Hill v. Comm'r of Soc. Sec.*, 560 F. App'x 547, 551 (6th Cir. 2014) ("disability is determined by the functional limitations imposed by a condition, not the mere diagnosis of it') (citing *Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988)). Nor are

---

[7] In her reply memorandum, plaintiff admits "there is not a clear connection between dizziness and the prescribed medication." (Doc. 29 at 11, n.5). Therefore, the ALJ did not err by failing to add restrictions in the RFC based on side effects from medication.

plaintiff's statements about her symptoms alone sufficient to prove she is disabled.  20 C.F.R. §

404.1529(a).[8]  Given the subjective nature of plaintiff's impairment, the ALJ reasonably

assessed the extent to which plaintiff's testimony and allegations of her limitations were

consistent with or corroborated by the record evidence.  The ALJ reasonably determined that

plaintiff's complaints and limitations were not as severe as suggested by her testimony, and

therefore plaintiff did not require accommodations in the RFC for a personal assistant to

accompany plaintiff or rest periods, as plaintiff asserts.  The ALJ found that as plaintiff's

clinical functioning improved, plaintiff engaged in physically demanding activities that

conflicted with her allegations of exertional and postural limitations.   (Tr. 27).   In this regard,

the ALJ noted that while plaintiff complained of extreme fatigue and limitations, she

nevertheless engaged in an exercise regimen that included yoga, walking, riding a recumbent

bicycle, traversing stairs, cardiovascular exercises several times per week, and vestibular

exercises, as well as performing some household chores.  (Tr. 27, 1284, 1287, 2809, 2810, 2865,

2986, 3053, 3060).   In addition, the ALJ noted that literature from the Mayo Clinic indicated

that 80% of people diagnosed with PPPD will get better with treatment and initial treatment lasts

only eight to twelve weeks.  (Tr. 27).  The ALJ further noted that plaintiff's use of devices, like

prism glasses, and coping mechanisms helped compensate for visual deficits and to mitigate her

symptoms such that she could perform the range of light work contemplated by the RFC.  (Tr.

---

[8] The regulation states, "There must be objective medical evidence from an acceptable medical source that shows
you have a medical impairment(s) which could reasonably be expected to produce the pain or other symptoms
alleged *and* that, when considered with all of the other evidence (including statements about the intensity and
persistence of your pain or other symptoms which may reasonably be accepted as consistent with the medical signs
and laboratory findings), would lead to a conclusion that you are disabled."  20 C.F.R. § 404.1529(a) (emphasis
added).

28, 1365, 1499, 1839-40, 2305, 2858, 2953, 2960-61, 2978; *see also* Tr. 1484, 1743, 1745, 1857, 2789, 3085, 3093). Finally, the ALJ considered that more recent evidence showed improvement in plaintiff's vision, including the ability to read for up to 40-minute increments and play a board game that required close visual focus. (Tr. 24, 28, 3093). The ALJ reasonably determined that such activities were inconsistent with plaintiff's allegations that dizziness and visual disturbances required her to take excessive breaks. This evidence, taken as a whole, does not indicate that "rest periods were necessary after exerting herself even in the smallest way," as plaintiff alleges. (Doc. 15 at 22, citing Tr. 1499, 2819, 2911).

To the extent plaintiff alleges the ALJ erred by not incorporating the opinions of Dr. Montecalvo and Mr. Wickstrom into plaintiff's RFC, the ALJ committed no error in this regard for the reasons stated above.

Plaintiff argues that the "record contains abundant evidence that proves [plaintiff] complained of dizziness that was brought on by activity or therapy" and that the Commissioner erred by "insist[ing] on the idea that plaintiff does not experience dizziness." (Doc. 29 at 10). Contrary to plaintiff's assertions, the ALJ accepted that plaintiff had persistent dizziness and formulated an RFC to accommodate the level of impairment resulting from plaintiff's dizziness. The ALJ limited plaintiff to work that involved no more than walking or standing for four hours, no climbing of ladders, ropes, or scaffolds, no fine print reading, and no exposure to hazards. However, the ALJ did not accept plaintiff's alleged "need to retreat from productive effort when dizziness is overwhelming" (Doc. 29 at 12), as plaintiff testified, because the ALJ reasonably determined that the extent of the limitations alleged by plaintiff was not supported by the record and that finding is supported by substantial evidence. The undersigned notes that even if substantial evidence would support a different conclusion or where a reviewing court would have

decided the matter differently, the ALJ's decision must be affirmed if it is supported by substantial evidence. *See Her v. Commissioner*, 203 F.3d 388, 389 (6th Cir. 1999). The ALJ appropriately reviewed all of the relevant medical evidence and evaluated the consistency of that evidence with plaintiff's alleged limitations in assessing the RFC. Accordingly, the ALJ's RFC determination is supported by substantial evidence and plaintiff's assignment of error is overruled.

### 3. Etiology for plaintiff's complaints of dizziness and medical improvement

Plaintiff alleges the ALJ placed undue emphasis on the lack of a specific etiology for plaintiff's complaints of dizziness and fatigue. Plaintiff alleges that some impairments, like fibromyalgia, do not have an etiology but can nevertheless be disabling. Plaintiff alleges her PPPD is similar. She points to the Mayo Clinic evidence in the record which defines persistent postural-perceptual dizziness as:

- A feeling of dizziness or unsteadiness that you have most of the time.
- You have this sensation almost every day.
- This sensation has lasted at least three months.

(Doc. 15, citing Tr. 3109). Plaintiff contends that the ALJ's focus on a need for etiology or causality of plaintiff's PPPD diminished all of the ALJ's findings, including what the ALJ was willing to believe about the impairment. (Doc. 15 at 16-17).

Plaintiff is correct that the ALJ noted that the medical testing performed over the years failed to identify an etiology or cause for plaintiff symptoms. The ALJ's decision states:

Although the claimant's reported subjective symptoms have remained consistent, medical evidence provides insufficient objective findings to corroborate her allegations of exertional, postural and environmental limitations especially those regarding weakness and her ability to ambulate. Although clinicians from the Mayo Clinic classified many of the claimant's reported symptoms as signs of persistent postural-perceptual dizziness, they provided no insight into the etiology or cause of these symptoms[.] 26F and 32F. Similarly, diagnostic evidence,

22

including pathology testing, radiological studies and vestibular testing provided no objective medical evidence to corroborate the claimant's allegations.

(Tr. 26).

While the ALJ did note the absence of evidence identifying a cause for plaintiff's symptoms, the ALJ nevertheless accepted that PPPD was a medically determinable severe impairment that could reasonably be expected to cause plaintiff's alleged symptoms. (Tr. 17, 26). The ALJ applied the sequential evaluation process and determined that plaintiff had an RFC for a reduced range of light work with additional restrictions to accommodate her complaints of dizziness. In assessing plaintiff's RFC, the ALJ considered plaintiff's statements about the limiting effects of dizziness and found that plaintiff's complaints were not fully corroborated. As explained above, the ALJ properly evaluated the intensity, persistence, and functional limitations of plaintiff's symptoms by considering objective medical evidence and other evidence, including: (1) plaintiff's daily activities; (2) the location, duration, frequency, and intensity of plaintiff's symptoms; (3) the precipitating and aggravating factors for her symptoms; (4) the type, dosage, effectiveness, and side effects of any medication taken to alleviate her symptoms; (5) treatment, other than medication, received for relief of her symptoms; (6) any measures used to relieve or mitigate her symptoms; and (7) other factors concerning functional limitations and restrictions due to plaintiff's symptoms. *See* 20 C.F.R. § 404.1529 and Social Security Ruling 96-7p, 1996 WL 374186 (July 2, 1996).[9] The ALJ noted that after her initial hospitalizations in 2013, plaintiff was treated conservatively with various

---

[9] Effective March 2016, SSR 96-7p has been superseded by SSR 16-3p, 2016 WL 1119029, which "provides guidance about how [the SSA] evaluate[s] statements regarding the intensity, persistence, and limiting effects of symptoms." There is no indication in the text of SSR 16-3p that the SSA intended to apply SSR 16-3p retroactively, and the Ruling therefore does not apply here. *Accord Cameron v. Colvin*, No. 1:15-cv-169, 2016 WL 4094884, at *2 (E.D. Tenn. Aug. 2, 2016).

forms of physical therapy and medications for the majority of the time period under consideration. (Tr. 26). The ALJ considered that plaintiff's ability to ambulate improved to the point that she no longer needed ambulatory aids and could perform a reduced range of light work, and that her activities demonstrated a greater functional capacity than she alleged. The ALJ did not improperly focus on the lack of a clear cause for plaintiff's symptoms to the exclusion of the other record evidence, which indicated that the severity of plaintiff's PPPD was not so great so as to preclude substantial gainful activity. Contrary to plaintiff's contentions, the ALJ properly considered plaintiff's subjective complaints in light of the record evidence and determined that plaintiff was less than fully credible based on the inconsistencies between plaintiff's testimony, the medical evidence, and other evidence of record. "[A]n ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997). Though there is some medical evidence supporting plaintiff's testimony, as the ALJ's credibility determination is substantially supported it should not be disturbed by this Court. *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983).

Plaintiff also alleges that the ALJ erred by citing to the evidence of improvement in plaintiff's condition when the minimal improvement plaintiff experienced was not consistent with the demands of full-time work. (Doc. 15 at 18). This argument in essence challenges the ALJ's RFC finding for a range of light work activity. The ALJ reasonably found that given the improvements in plaintiff's vision and her ability to ambulate over the relevant time period, considered in conjunction with the other record evidence, which included plaintiff's relatively rigorous daily activities, plaintiff retained the RFC for a range of light work. The ALJ

considered and discussed all of the relevant objective, clinical, and opinion evidence, as well as plaintiff's subjective statements regarding her limitations, and in determining that plaintiff retained the RFC for a range of light work.   Plaintiff's first and second assignments of error are overruled.

### IT IS THEREFORE ORDERED THAT:

The decision of the Commissioner is **AFFIRMED** and this case be closed on the docket of the Court.

Date: _9/26/19_

Karen L. Litkovitz
United States Magistrate Judge